UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | |
|---|---|
| ROBERT MARKHAM TAYLOR, ) | |
| ) | |
| Petitioner, ) | No. 5:22-CV-159-REW-HAI |
| ) | |
| v. ) | |
| ) | RECOMMENDED DISPOSITION |
| SCOTT JORDAN, Warden, ) | |
| ) | |
| Respondent. ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

On June 15, 2022, Petitioner Robert Taylor filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. D.E. 1. Because the petition was not signed by him, the undersigned ordered Taylor to refile a corrected petition. D.E. 8. On July 15, Taylor filed his signed petition. D.E. 10. The Warden responded and attached portions of the record. D.E. 17. The Warden also conventionally filed a CD containing the written and video record. D.E. 18. Taylor's reply was docketed on January 6, 2023. D.E. 21. For the reasons described herein, the undersigned recommends that the petition be **DENIED**.

**I. Background**

Following a jury trial, Taylor was convicted of murder, kidnapping, and tampering with physical evidence. The Fayette Circuit Court sentenced Taylor, per the jury's recommendation, to twenty-years each for murder and kidnapping and five years for tampering with physical evidence, to be served consecutively for a total term of imprisonment of forty-nine years. On direct appeal, the Kentucky Supreme Court described the background of this case as follows:

> On December 20, 2013, Alex Johnson was killed and his body placed in a barrel, which was then left in the Kentucky River near Interstate 75. The last two

1

people to see Johnson alive were Taylor and Timothy Ballard (a.k.a. "Tiny"). What emerged at trial were two conflicting narratives as to the final hours of Johnson's life.

### A. Ballard's Testimony.

Ballard testified for the Commonwealth that he and Taylor met while working at a bar in Lexington; Ballard worked as a bouncer and Taylor as a bartender. Ballard had also worked for Taylor as a part-time chauffeur. At Taylor's request, Ballard used a borrowed truck to pick up an industrial, fifty-five gallon barrel from Taylor's residence and took it to Taylor's commercial garage. Ballard drove Taylor to Johnson's home the next evening, December 20, 2013, to pick Johnson up and take them both to Trust Lounge, a nightclub in the area.

Johnson sat in the front passenger seat, with Ballard driving and Taylor sitting directly behind Johnson. As Ballard drove away from Johnson's home, Taylor placed Johnson in a choke hold from behind. Taylor pulled Johnson into the backseat and began beating him. Two people called 911, reporting that there was an altercation inside a vehicle on the street where Johnson lived. One reported "bloodcurdling screams" from the vehicle. The same caller also reported that the driver was "a big guy" and the two in the back were the ones involved in the fight.

Ballard stopped the vehicle on the street after someone (he could not identify whether it was Taylor or Johnson) said to "stop the car." Taylor got out of the car and Ballard went to see what was happening in the back of the vehicle. Taylor pulled Johnson out of the car and went to the driver's seat. Ballard tried to help Johnson but Johnson hit him so Ballard proceeded to punch him at least twice and forced Johnson back into the vehicle's backseat. Ballard tried to get in the backseat as well but could not fit. Taylor began driving away while Ballard's legs were still hanging out of the vehicle.

Taylor pulled into an empty lot on a dead-end street. He got out of the vehicle, went to the backseat, and began hitting Johnson once more. When Taylor finally stopped hitting Johnson, he returned to the passenger seat and Ballard drove them away. Ballard heard Johnson's last gurgling breath as they left the lot.

Ballard drove the car to Taylor's garage, and the two men placed Johnson's body in the barrel. Using the borrowed truck, Ballard took the body to the Kentucky River and let it roll in from the truck bed. Taylor cleaned up the vehicle they'd used that evening while Ballard was gone. Both men then went to Taylor's apartment to change clothes. They went to Johnson's apartment and Taylor recovered approximately $36,000 in cash, twenty-six pounds of marijuana, and some psilocybin mushrooms. Taylor divided the money with Ballard.

Ballard drove them to Trust Lounge, where Taylor socialized, danced, and mingled for a couple of hours, as seen on Trust's surveillance video. Ballard ultimately confessed on January 20, 2014, after investigators confronted him with cell phone records, surveillance video, and other evidence. He led them to where he had dumped Johnson's body.

**B. Taylor's Testimony.**

Taylor testified at trial but told a markedly different story. Taylor explained that he had known Johnson because they were both marijuana dealers, and Johnson had been Taylor's supplier. He described Johnson as a good friend who was planning to hand over his drug dealing business to him. Taylor agrees that, on the night of December 20, 2013, Ballard drove them to pick up Johnson at his apartment to go to Trust but disagrees about what transpired from that point.

Taylor had ingested a hallucinogenic drug known as "Molly," and brought some to share with Johnson that evening. He and Johnson got in the car with Ballard; Ballard was driving, Johnson was in the front passenger seat, and Taylor was in the backseat. Johnson made an off-hand remark to Ballard, something along the lines of "what's up, bitch?" and Ballard immediately began assaulting Johnson while he was still driving the vehicle. Taylor was texting and did not notice what was happening until Ballard had already hit Johnson eight or nine times. Johnson was screaming the entire time of the assault.

Ballard stopped the car, went to the passenger seat, and proceeded to hit Johnson until he stopped screaming. He said to Johnson, "I've got witnesses now. I might as well kill you." Johnson was slumped over, partially hanging from the vehicle. Ballard could not get him back into the vehicle so he drove off while Johnson's legs were still hanging outside the car door. Ballard stopped again and Taylor pulled Johnson from the car. Johnson was still breathing and Taylor said they should take Johnson to the hospital. Taylor got into the driver's seat but was disoriented. He turned around and saw that Ballard was on top of Johnson in the back seat, assaulting him again. Taylor heard Ballard choking Johnson to death.

Taylor stopped the car, got out of the vehicle, and tried to get Ballard off Johnson. He hit Ballard maybe fifteen times until Ballard finally released Johnson. Taylor pulled Johnson from the vehicle and tried to resuscitate him but was unsuccessful. Taylor testified that Ballard threatened him; Taylor claims he was highly intoxicated and did not know what to do.

From there, Taylor admitted; he and Ballard took Johnson's body to his garage; put his body in the 55 gallon barrel; and Ballard disposed of the body in the

> Kentucky River. Taylor admitted to cleaning out his car and having his garage cleaned as well. He also testified that he ingested more Molly that evening, and he and Ballard went to Trust, where he socialized, drank, and danced.
>
> It is undisputed that Taylor was arrested in Texas, approximately two miles from the Mexican border on January 22, 2014. He had in his possession about $10,000 in cash, about two pounds of marijuana, three cell phones, clothing, two handguns, ammunition, and copies of two books, *The Prince* and *The Smuggler's Ghost: when marijuana turned a Florida Teen into a millionaire fugitive*.

*Taylor v. Commonwealth*, No. 2016-SC-000410-MR, 2017 WL 5034477, at *1-*3 (Ky. Nov. 2, 2017) (footnotes omitted).

The Kentucky Supreme Court affirmed the conviction and sentence on November 2, 2017. *Id.* at 12.  Taylor did not petition for a writ of certiorari from the United States Supreme Court.

On August 31, 2018, Taylor filed separate Rule 11.42 and 60.02 motions for post-conviction relief.  The trial court denied both motions by separate orders entered on April 22, 2019. Taylor appealed both orders. The Kentucky Court of Appeals consolidated the two cases and affirmed the trial court's orders denying relief on June 11, 2021.  *Taylor v. Commonwealth*, Nos. 2020-CA-0565-MR, 2019-CA-0810-MR, 2021 WL 2385847 (Ky. Ct. App. June 11, 2021).  The Kentucky Supreme Court denied discretionary review on December 8, 2021, in case 2021-SC-0260.

**In his federal habeas petition, Taylor challenges the prior court decisions related to (1) trial counsel's ineffectiveness for failure to investigate an alleged exculpatory witness and (2) alleged ineffectiveness of trial and appellate counsel regarding the kidnapping jury instruction.  D.E. 10 at 5, 7.**

The Warden addresses both of these issues in his Answer, and Taylor replied.  D.E. 17, D.E. 21.

4

## II. Legal Standards

A state prisoner has a statutory right to collaterally attack his conviction or sentence. *West v. Bell*, 242 F.3d 338, 346 (6th Cir. 2001). A state prisoner may seek federal habeas corpus relief based on being held in custody in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a).

The Antiterrorism and Effective Death Penalty Act, Pub L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA") requires "heightened respect" for legal and factual determinations made by state courts. *Sinkfield v. Brigano*, 487 F.3d 1013, 1016 (6th Cir. 2007).

Section 2254(d), as amended by AEDPA, provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

AEDPA establishes a "highly deferential" standard of review that is "difficult to meet." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). All the state court's factual findings are presumed to be correct; they can be rebutted only by "clear and convincing evidence." *Mitchell v. Mason*, 325 F.3d 732, 737-38 (6th Cri. 2003), *cert. denied*, 543 U.S. 1080 (2005); 28 U.S.C. § 2254(e)(1). Legal conclusions made by state courts also receive substantial deference under AEDPA. "[A] federal habeas corpus court may overturn a state court's application of federal law only if it is so erroneous that there is no possibility fairminded jurists could disagree that the state court's decision

conflicts with this Court's precedents." *Nevada v. Jackson*, 569 U.S. 505, 508-09 (2013) (per curiam) (internal quotation marks omitted). Also, "circuit precedent does not constitute clearly established Federal law" under AEDPA. *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (internal quotation marks omitted). In sum, "federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015).

Therefore, the question before this Court is not merely whether the Kentucky courts were incorrect, but whether they were so wrong that their treatment of the law and facts was "unreasonable" under these deferential standards.

### III. Law Governing Ineffective Assistance Claims

Taylor's petition includes claims of ineffective assistance of counsel ("IAC"). An ineffective-assistance-of-counsel claim presents a mixed question of law and fact. *Mitchell v. Mason*, 325 F.3d 732, 738 (6th Cir. 2003). To successfully assert an IAC claim, a defendant must prove both deficient performance and prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006).

To prove deficient performance, a defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. A defendant meets this burden by showing "that counsel's representation fell below an objective standard of reasonableness" as measured under "prevailing professional norms" and evaluated "considering all the circumstances." *Id.* at 688. However, a reviewing court may not second-guess trial counsel's strategic decisions. *Moss v. Hofbauer*, 286 F.3d 851, 859 (6th Cir. 2002). Thus, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is,

6

the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quotations omitted). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*

To prove prejudice under the second prong of *Strickland*, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Thus, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. When evaluating prejudice, courts generally must consider the "totality of the evidence." *Id.* at 695. Courts may approach the *Strickland* analysis in any order, and an insufficient showing on either prong ends the inquiry. *Id.* at 697.

The Supreme Court has repeatedly commented on the interaction between AEDPA deference under § 2254(d) and *Strickland*'s standards of review. "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). Under § 2254, "[a] state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id.* Both standards are "'highly deferential' and when the two apply in tandem, review is 'doubly'" deferential. *Id.* at 105 (citations omitted). Under § 2254(d), "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that

7

counsel satisfied *Strickland*'s deferential standard." *Id.* Also, because the *Strickland* standard is a "general" standard, "the range of reasonable applications is substantial." *Id*.

## IV. Analysis

### A. Ground One – Investigation of Exculpatory Witness

Taylor claims that the Kentucky Court of Appeals' holding affirming the trial court's finding that trial counsel was not ineffective for failing to investigate James Gayheart was based on an unreasonable determination of fact.

After accurately articulating the *Strickland* standard, the Kentucky Court of Appeals addressed this claim as follows:

> Gayheart was an alleged witness to the incident who called 911 to report what he observed. Taylor contends that Gayheart would have testified that he witnessed Timothy Ballard striking the victim through the open door of the car, rather than Taylor pulling the victim into the backseat as Ballard indicated in his trial testimony. Although Gayheart was apparently the target of a subpoena by the Commonwealth to testify at trial, he did not testify, allegedly because officers could not locate him to serve the subpoena. In fact, the Commonwealth advised the circuit court that police believed Gayheart was homeless at the time of the trial.
>
> A recording of Gayheart's 911 call was played at trial. On the 911 call, Gayheart revealed the same exculpatory information that Taylor contends he would have provided under oath if he had testified at trial. Taylor provides no evidence to suggest that a reasonable investigation into Gayheart by his trial counsel would have uncovered further mitigating evidence in his favor. Further, we agree with the circuit court that it was not unreasonable for Taylor's counsel not to subpoena Gayheart to appear at trial. It is improbable that a subpoena procured by Taylor's counsel would have made Gayheart any more likely to appear at trial, as the Commonwealth was unable to serve Gayheart due to his alleged homelessness. We believe the decision not to subpoena Gayheart was a reasonable tactical decision which must be given a strong presumption of correctness. *Hodge*, 68 S.W.3d at 344.

*Taylor*, 2021 WL 2385847 at *3 (footnote omitted).

Taylor specifically takes issue with the Kentucky Court of Appeals' finding that Gayheart's 911 phone call contained the same exculpatory information that Taylor asserted would have been

8

provided under oath if Gayheart testified at trial. D.E. 10-1 at 13. Gayheart's 911 call was played during trial. As Taylor included in his memorandum attached to the § 2254 petition, the transcription of that 911 call is as follows:

> 911: Lexington 911, what is your emergency?
>
> GAYHEART: Yeah, there's an emergency over in um…on um…Hanover Ave. Somebody is beating somebody to death in a car.
>
> 911: What color and type of car is it?
>
> GAYHEART: I'm not for sure. They're just taking off…um…
>
> 911: Is it Hanover Ct. and Aurora Ave.?
>
> GAYHEART: Hanover. Yeah. They're just taking off. They made a left…um…
>
> 911: A left onto what?
>
> GAYHEART: Hold on. I'm gonna (inaudible) that street. They're gonna end up on Winchester Rd.
>
> 911: But you couldn't tell what color and type of car it was?
>
> GAYHEART: No, it's a…they made a left on Aurora Ave.
>
> 911: Alright. Thank you.
>
> GAYHEART: Alright.

Taylor Trial Rec. 10:33:51 – 10:34:43, June 07, 2016; *see also* D.E. 10-1 at 7.

However, Gayheart was interviewed by detectives prior to trial on January 6, 2014. D.E 10-2 at 1-7. During that interview, Gayheart revealed more details about what he witnessed, including that someone in the passenger seat "was hanging out of the vehicle" being dragged and looked "like he was hung up on his seat belt." *Id.* at 2. Gayheart also told the detectives that the driver exited the vehicle, walked around to the passenger door, and "started throwing punches" at the person hanging out of the vehicle. *Id.* The person hanging from the passenger seat yelled,

9

"Stop! Stop! You're killing me. You're killing me." *Id.* The driver reportedly saw Gayheart and stated, "Look, I got a witness. I got a witness, I ought' a go on and kill ya now." *Id.* Gayheart stated that he saw the driver walk around the car, get back into the driver's seat, and drive away. *Id.* Gayheart described the driver as a 6'4" black man. *Id.* at 4. Gayheart also stated that he "never did get that close to the car but . . . would almost say that nobody else was in the car." *Id.* at 5.

Taylor asserts that Gayheart's interview with detectives refutes testimony at trial that Taylor pulled Johnson into the back seat and supports that Ballard killed Johnson. D.E. 10-1 at 15. The Warden addresses Taylor's claim by arguing that the Kentucky Court of Appeals reasonably applied clearly established federal law. D.E. 17 at 8-11. In doing so, the Warden fails to acknowledge Gayheart's interview with detectives and instead asserts that "the alleged exculpatory information Taylor contended that Gayheart would have provided was included in the 911 call that was played for the jury." D.E. 17 at 10. The Kentucky Court of Appeals made the same finding. *Taylor*, 2021 WL 2385847 at *3. But Gayheart's pre-trial interview with the detectives included much more detail than the largely non-substantive 911 call that was played at trial. Notably, Gayheart only witnessed one individual, the driver, get out of the vehicle to assault the person hanging from the passenger side. After stating, "I ought' a go on and kill ya now," the individual returned to the driver's seat and drove the vehicle away from Gayheart. This and other details were not included in Gayheart's 911 call. Yet, the Kentucky Court of Appeals based its holding, at least in part, on the 911 call having the ***same*** exculpatory information as Taylor alleged Gayheart would testify to at trial.[1] *Id.* The call did not contain the same exculpatory information

---

[1] The Kentucky Court of Appeals also based its holding on the inability to *serve* Gayheart with the Commonwealth's subpoena. *Taylor*, 2021 WL 2385847 at *3. However, as the Warden points out, the Kentucky Court of Appeals slightly misconstrued this part of the record. *See* D.E. 17 at 9. Gayheart was successfully served with the subpoena but did not appear to testify. Taylor Trial Rec. 08:46:20-08:46:50, June 07, 2016. Gayheart was believed to be

10

as the interview, so this factual description by the Court of Appeals was wrong. The impact of this mistake, however, is more complicated than Taylor understands.

Even assuming the Kentucky Court of Appeals' decision was based on an unreasonable determination of fact, this would not end the Court's inquiry. *Rice v. White*, 660 F.3d 242, 257 (6th Cir. 2011) ("It is not enough that Petitioner show an unreasonable determination of fact under § 2254(d)(2) – doing so only removes AEDPA's litigation bar."). "Once the bar is removed, Petitioner must show that he is being held in violation of federal law by identifying, and prevailing on, a federal claim. *Id.* (collecting cases). This would mean a classic ineffective assistance of counsel claim without the double-deference due described in *Harrington v. Richter*.

Taylor's constitutional claim is that his trial counsel was ineffective for failing to investigate Gayheart. Specifically, Taylor argues that, "[b]y failing to investigate Gayheart, Trial Counsel was uninformed that he would have corroborated Taylor's assertions and refuted the entire case in chief of the Commonwealth." D.E. 10-1 at 15. But Taylor's counsel appears to have known about Gayheart's interview with detectives at the time of the trial. First, Taylor admits in his supporting memorandum that the summary of the Gayheart interview was provided in pretrial discovery. D.E. 10-1 at 14. Further, when discussing the inability to locate Gayheart with the Commonwealth and trial court, defense counsel specifically mentioned the interview and argued that the discrepancies therein necessitated Gayheart's testimony. Taylor Trial Rec. 08:49:26 – 08:49:52, June 07, 2016. Defense counsel further argued against the admission of Gayheart's 911 call without his presence at trial. Taylor Trial Rec. 08:49:29-08:49-52, June 7, 2016. The trial

---

homeless at that time and could not be located. *Id.* The Court offered to issue an arrest warrant for Gayheart, which the defense accepted, but the record does not indicate it was ever executed. *Id.* at 08:51:02-08:51:15. In any event, this misstatement of a procedural fact does not appear to have any effect on the ultimate conclusion of the Kentucky Court of Appeals that a subpoena procured by the defense would not have been any more successful than the one issued by the Commonwealth. *Taylor*, 2021 WL 2385847, at *3. Further, Taylor does not challenge this particular portion of the Kentucky Court of Appeals' opinion.

11

court held that the 911 call could be played for the jury without Gayheart's presence and offered to issue an arrest warrant for Gayheart, which defense counsel approved. Taylor Trial Rec. 08:51:02-08:51:06, June 7, 2016. The record therefore supports that defense counsel was aware of Gayheart's interview with police and was prepared to highlight the discrepancies between Gayheart's statement to police, his 911 call, and the testimony of other witnesses in the event he could be located to testify. However, the record also indicates that Gayheart simply could not be procured to testify. Taylor has provided no evidence that defense counsel's efforts to subpoena Gayheart would have been any more successful than the Commonwealth's and counsel did request that the trial court issue an arrest warrant for him. Taylor has not provided any evidence that a subpoena by the defense would have been any more successful or executed in a different manner than the arrest warrant.

Taylor also cites to Gayheart's and Ballard's post-trial affidavits in support of his claim. D.E. 10-1 at 16-17. Gayheart's affidavit undermines, rather than supports, Taylor's claim that his counsel should have investigated and obtained the statements therein prior to or during trial. In the affidavit, Gayheart identifies Ballard as the driver he saw assaulting the person hanging from the passenger side of the vehicle. D.E. 10-2 at 9. However, Gayheart's affidavit also indicates:

> When the trial started, I was in a really bad situation. I was addicted to drugs and strung out on the street. Lexington is not exactly hospitable to people who bare witness at trial and since I was a transient, I was particularly susceptible to trouble. I was scared because my name was all over the news. When I saw the trial on TV *I knew I was needed but I hid*.

*Id.* (emphasis added). Gayheart's affidavit includes his own admission that he was actively avoiding his appearance and testimony at trial out of fear for his own safety. There is no evidence to show that Taylor's counsel could have overcome those efforts, found Gayheart, and secured his

12

presence at trial. Thus, Taylor has not shown any deficient performance or prejudice from his counsel's failure to subpoena or further investigate Gayheart.

Additionally, Taylor has not asserted any claim that counsel was ineffective for failing to elicit the information in Ballard's affidavit prior to or during trial. Thus, Ballard's affidavit is immaterial to the Court's analysis. Further, Taylor's brief indicates the "Summary of Gayheart interview 01/10/2014 by Steve O'Daniel, investigator for Johnson Family" was included in the attachments to his petition. D.E. 10-1 at 14. However, no such summary is in the record, and neither Taylor's petition nor his memorandum makes further mention of this summary. Further, it does not appear from the record that Taylor presented this summary to either the trial court or Kentucky Court of Appeals. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."). Thus, any interview of Gayheart by the Johnson family's investigator is not properly before the Court and is not included in its analysis.

Next, to the extent Taylor argues that his counsel should have attempted to admit Gayheart's statements to police without his presence at trial, he has not addressed whether these statements would have been admissible. *Hodge v. Haeberlin*, 579 F.3d 627, 644 (6th Cir. 2009) (holding that a defendant "cannot establish that his counsel was ineffective for failing to gain admission of [witness] testimony without first establishing that [the] testimony was admissible"). Indeed, the interview with detectives would likely ***not*** have been admissible in the absence of Gayheart's testimony at trial. *See McKinney v. Horton*, 826 F. App'x 468, 476-77 (6th Cir. 2020) (holding that, because the witness did not testify at trial, the recording of his interview with police would have been inadmissible hearsay for the purposes of establishing the defendant's innocence).

13

Thus, any claim that Taylor's counsel was ineffective for failing to move for the admission of Gayheart's interview with police also fails.

For these reasons, even if the Kentucky Court of Appeals made an unreasonable determination of fact and AEDPA deference does not apply, Taylor's ineffective assistance of counsel claim still fails. He has shown neither an error by counsel nor sufficient prejudice. Accordingly, the undersigned recommends that Taylor's first ground for relief be denied.

### B. Ground Two – Sufficiency of the Evidence

Next, Taylor attacks the state courts' rulings regarding his claim that his trial and appellate counsel were ineffective for their failure to argue that the kidnapping jury instruction was unsupported by sufficient evidence. D.E. 10 at 7. Taylor raised the underlying IAC/IAAC claims through his 11.42 motion. The Kentucky Court of Appeals addressed this claim as follows:

> Second, Taylor alleges that his trial counsel was ineffective for her failure to object, and his appellate counsel was ineffective for her failure to argue, that the jury instructions regarding kidnapping lacked sufficient evidentiary support. We note that "[i]nsufficient evidence is not a proper ground for RCr 11.42 relief." *Bartley v. Commonwealth*, 463 S.W.2d 321, 322 (Ky. 1971). Accordingly, this argument is not properly before this Court, and we decline to address it herein.
>
> . . .
>
> Likewise, Taylor made the argument on direct appeal that the kidnapping exemption under KRS 509.050 did not apply, and thus the circuit court erred in providing an instruction on kidnapping to the jury. That conviction-and the related jury instruction-was affirmed by the Kentucky Supreme Court in *Taylor*, No. 2017 WL 5034477, and we decline to address the issue further.

*Taylor*, 2021 WL 2385847 at *2, n.1. The Warden asserts that Taylor's claim was "improper because it was a rehash of his sufficiency of the evidence argument from his direct appeal disguised as a claim of ineffective assistance of counsel." D.E. 17 at 13. The Warden further argues that, because the Kentucky Court of Appeals denied this claim on procedural grounds, it is defaulted. *Id.* In his reply, Taylor argues that a sufficiency of the evidence claim, which ***was not*** raised on

14

direct appeal, is different from a claim that the exemption under Ky. Rev. Stat. § 509.050 applied to his case, which *was* raised on direct appeal. D.E. 21 at 2-3.

Regardless of whether this claim is procedurally defaulted, Taylor cannot show any prejudice from his counsel's failure to raise the claim at trial or on appeal. On direct appeal, the Kentucky Supreme Court analyzed the kidnapping exemption statute and found that it did not apply based on state caselaw:

> Ballard testified that he and Taylor drove Johnson to the empty lot where Taylor continued to beat Johnson, and then they drove away from that location and Johnson gave his last "gurgling" breath. According to Ballard, he and Taylor kept Johnson captive after the assault ended, but before Johnson's death. Even Taylor admits that they forced Johnson back into the vehicle two separate times before Johnson finally succumbed to his injuries.
>
> Like *Wood*, this restraint was unnecessary to the completion of the murder and exceeded what was necessary to complete the underlying offense. Like in *Wood*, Ballard and Taylor could have left Johnson on the street or in the empty lot where he was beaten. But according to both Ballard's and Taylor's testimony, they put Johnson back into the car and took him away from the lot. Both men testified that it was after this point that Johnson ultimately died.
>
> The exemption must be narrowly construed. *See Arnold*, 192 S.W.3d at 326 (quoting *Murphy*, 50 S.W.3d at 180). Under these facts, and narrowly construing the exemption as we must, the trial court did not abuse its discretion in refusing to apply the kidnapping exemption.

*Taylor v. Commonwealth*, 2016-SC-000410-MR, 2017 WL 5034477, at *4 (Ky. Nov. 2, 2017). The Kentucky Supreme Court also addressed Taylor's claim that the kidnapping jury instruction was given in error because the exemption applied and held, "Because we hold that the trial court correctly found that the exemption did not apply, we discern *no error* in the court's instruction on kidnapping." *Id.* (emphasis added). As the Kentucky Court of Appeals noted, the Kentucky Supreme Court clearly affirmed and held that there was *no* error in the kidnapping instruction. *See Taylor*, 2021 WL 2385847 at *2, n.1. This forecloses Taylor's argument that the instruction was given in error because of insufficient evidence. Importantly, Taylor's argument is vague,

15

undeveloped, and does not address the evidence that was presented to the jury or the elements necessary to sustain a kidnapping conviction.

"The Sixth Circuit has made clear that 'there can be no constitutional deficiency' in failing to raise meritless arguments." *United States v. Gooden*, Criminal Action No. 15-5-DCR-CJS-4, 2017 WL 9325622 at *9 (E.D. Ky. Nov. 30, 2017), *report and recommendation adopted*, No. CR 5:15-05-DCR, 2018 WL 276132 (E.D. Ky. Jan. 3, 2018) (quoting *Maples v. Coyle*, 171 F.3d 408, 413 (6th Cir. 1999)). Neither deficient performance nor prejudice can stem from defense counsel's failure to make the meritless argument that the kidnapping jury instruction was unsupported by sufficient evidence. The Kentucky Supreme Court clearly held that there was no error in that instruction. Thus, regardless of whether this claim is procedurally defaulted, it fails on the merits. Accordingly, the undersigned recommends that Taylor's second ground for relief also be denied.

## V. Conclusion

For the reasons discussed above, the Court **RECOMMENDS** that Taylor's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (D.E. 10) be **DENIED**.

Although Taylor did not request one, no evidentiary hearing is warranted. "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief. *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

The Court further **RECOMMENDS** that no certificate of appealability ("COA") issue. A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard requires a petitioner to demonstrate

that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks omitted). Under this standard, the petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.*

Reasonable jurists would not find that the petition should have been resolved in a different manner. The Kentucky Court of Appeals relied upon an incorrect factual conclusion, but, even without AEDPA deference, Taylor's claim concerning obtaining Gayheart's appearance and testimony lacks evidentiary support. His second claim is wholly without merit. Taylor's claims are insufficiently viable to deserve encouragement to proceed further.

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights and mechanics concerning this recommended disposition, issued under subsection (B) of the statute. *See also* Rule 8(b) of the Rules Governing Section 2254 Proceedings. Within **fourteen days** after being served with a copy of this decision, any party may serve and file specific written objections to any or all findings or recommendations for determination, *de novo*, by the District Court. Failure to make a timely objection consistent with the statute and rule may, and normally will, result in waiver of further appeal to or review by the District Court and Court of Appeals. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Wandahsega*, 924 F.3d 868, 878 (6th Cir. 2019).

This the 6th day of July, 2023.



Signed By:
Hanly A. Ingram
United States Magistrate Judge

17